**DRESSER INDUSTRIES, INC. and Houston Fishing Tools Company, Appellants,**

v.

**PAGE PETROLEUM, INC., et al., Appellees.**

No. 10–89–147–CV.

Court of Appeals of Texas, Waco.

Dec. 4, 1991.

Rehearing Denied Jan. 15, 1992.

Kent C. Sullivan, McFall & Sartwelle, P.C., Jennifer Bruch Hogan, Fulbright & Jaworski, Houston, for appellants.

Jess Hall, Jr., Liddell, Sapp, Zivley, Hill & Laboon, Houston, J.G. Adami, Jr., Perkins, Oden, Warburton, McNeill, Adami & Paisley, P.C., Alice, for appellees.

Before THOMAS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

THOMAS, Chief Justice.

Page Petroleum, Inc. and the other owners of a lease sued Dresser Industries, Inc. and Houston Fishing Tools Company for negligently damaging an uncompleted oil well, which resulted in the well being abandoned and the drilling of a replacement well. The jury found that Page [1], Dresser, and Houston were negligent, attributed 50% of the negligence to Page, 40% to Houston and 10% to Dresser. Dresser and Houston contend they were entitled to a take-nothing judgment because their contracts with Page absolved them from any liability for negligence.

Principal questions relate to whether the provisions relied on by Dresser and Houston are releases or indemnity agreements and whether they bar Page's recovery. We hold that Dresser's provision is an indemnity agreement which only protects it against claims of third parties, not against liability to Page. Therefore, we affirm the judgment against Dresser. However, we hold that Houston is entitled to a take-nothing judgment against Page because its

---

1. We refer to the plaintiffs as "Page" because Page was the operator of the well under an agreement with the other owners of the lease.

provision is a release of liability. Accordingly, we reverse and reform the judgment to provide that Page take nothing against Houston.

## WHAT HAPPENED

Page had drilled the well to a depth of 11,000 feet when it asked Dresser to log and test it. A Page representative signed a document containing the provision Dresser relies on to absolve it from liability. After a piece of equipment Dresser was using to test formations became stuck in the well bore, Page called in Houston to "fish" it out. Page's representative signed the document which Houston claims releases it from all liability. While trying to retrieve the stuck equipment, Houston lost several thousand feet of wireline and drill pipe down the well bore, which could not be dislodged. Page was later forced to abandon the well and drill a replacement well.

## CONTENTIONS

The parties disagree whether the provisions require Page to indemnify Houston and Dresser against their own negligence or merely release them from any liability to Page. Interpreting the provisions as requiring indemnity, Page argues that their enforcement is governed by the statutes and rules relating to indemnity contracts. It contends the provisions are unenforceable because (1) they were not conspicuous enough to give fair notice that Page would be obligated to indemnify Houston and Dresser against their own negligence, (2) they violated the express-negligence doctrine, and (3) they violated section 127.003 of the Civil Practices and Remedies Code, which voids any agreement pertaining to an oil or gas well that purports to indemnify a person against his own negligence. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 127.-003(a)(1) (Vernon 1986).

Houston and Dresser interpret the provisions as exculpatory, involving a release of liability rather than requiring indemnity against claims of third parties. Based on findings that Page's representatives were authorized to bind Page to the agreements, Houston and Dresser each filed motions asking the court to disregard the negligence findings and to enter a judgment that Page take nothing.

## DISTINGUISHING INDEMNITY FROM RELEASE

■ A release of liability and an indemnity agreement have unique characteristics that distinguish one from the other. A release surrenders legal rights or obligations between the parties to the agreement. *Cox v. Robison,* 105 Tex. 426, 150 S.W. 1149, 1155 (1912). A release extinguishes the claim or cause of action as effectively as would a prior judgment between the parties and is an absolute bar to any right of action on the released matter. *Hart v. Traders & General Ins. Co.,* 144 Tex. 146, 189 S.W.2d 493, 494 (1945).

■ An indemnity agreement arises, however, from a promise by the indemnitor to safeguard or hold the indemnitee harmless against either existing or future loss or liability, or both. *Russell v. Lemons,* 205 S.W.2d 629, 631 (Tex.Civ.App.—Amarillo 1947, writ ref'd n.r.e.). Rather than extinguishing a cause of action, which is the effect of a release, the indemnity contract creates a potential cause of action in the indemnitee against the indemnitor. *Id.* If the undertaking is to indemnify against liability, the cause of action matures when the indemnitee incurs liability covered by the agreement. *Id.* But, if the obligation is to indemnify against loss, damage or injury, the right of action accrues on actual payment of the loss by the indemnitee. *Id.*

■ Another significant distinction exists between a release of liability and an indemnity agreement. A release extinguishes any actual or potential claim for liability and injury the releasor might have against the releasee, without regard to the releasee's actual or potential liability to third parties. *See Whitson v. Goodbodys, Inc.,* 773 S.W.2d 381, 383 (Tex.App.—Dallas 1989, writ denied). In contrast, a contract of indemnity does not relate to liability claims between the parties to the agreement but, of necessity, obligates the indemnitor to protect the indemnitee against lia-

bility claims of persons not a party to the agreement. *Id.*

We will examine the provisions with these distinctions in mind, applying the rules governing the interpretation of contracts to determine whether the parties intended the provisions to indemnify or release liability. *See Spence & Howe Construction Co. v. Gulf Oil Corp.*, 365 S.W.2d 631, 632 (Tex.1963) (indemnity); *Quebe v. Gulf, C. & S.F. Ry. Co.*, 98 Tex. 6, 81 S.W. 20, 21–22 (1904) (release). Their intent will be gleaned from the language of the provisions. *See City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex.1968).

### DRESSER PROVISION

■ Dresser relies on the following provision to relieve it from liability to Page:

3. There are obviously many conditions in and about the well of which we can have no knowledge and over which we can have no control. Therefore, we accept this service order only on condition that we do not guarantee any particular results from services to be performed hereunder. Except where damage or injury is caused by gross or willful negligence on our part, *[Page] shall indemnify [Dresser] and hold [Dresser] free and harmless from all claims for* personal injuries, including death and damage, including *subsurface damage or injury to the well* and damages attributable to pollution or contamination and cost of control and removal thereof, alleged to have been caused by our operations under this service order, *including claims alleging that injuries or damages were caused by [Dresser's] negligence, whether such claims are made by [Page], by [Page's] employees, or by third parties.*

(Emphasis added).

Drawing together the italicized language, the parties unambiguously intended Page to "indemnify [Dresser] and hold [Dresser] free and harmless from all claims for … subsurface damage or injury to the well …, including claims alleging that injuries or damages were caused by [Dress-

er's] negligence, whether such claims are made by [Page], by [Page's] employees, or by third parties." The terms "indemnify" and "hold … free and harmless" clearly stamp the provision as one of indemnity. Furthermore, Page is expressly obligated to protect Dresser from claims asserted by persons not a party to the agreement— "[Page's] employees and third parties"— which is a distinguishing feature of indemnity.

However, Page also agreed to *indemnify* Dresser against all claims, regardless of "whether such claims are made by [Page]" or third parties, which if taken literally would require Page to protect Dresser against Page's own liability claims. Such a literal interpretation, however, would create a *non sequitur*. Logically, Page could release a future claim against Dresser but not indemnify Dresser against such a claim. To conclude otherwise would produce an absurdity: Dresser's indemnity action would mature upon its payment of damages on Page's claim, which then would entitle Dresser to recover those damages from Page. Considering the unambiguous expression of the parties' intent that Page was to indemnify Dresser, inserting Page's name among the parties whose claims were to be indemnified was clearly inadvertent because it lacked any legal significance in the sense in which it was used and was repugnant to the intent of the parties. In the circumstances, the word "Page" can be disregarded as surplusage in interpreting the provision. *See Trinity Portland Cement Co. v. Lion Bonding & Surety Co.*, 229 S.W. 483, 485 (Tex.Comm'n App.1921, judgm't adopted).

Based upon the clearly expressed intent of the parties contained in the language of the document, Dresser's provision is one of indemnity rather than a release of liability.

Dresser pled the provision as an affirmative defense to Page's cause of action, which is based on Dresser's negligence. However, because the parties intended the provision to protect Dresser against claims of third parties, rather than to extinguish any negligence claim Page might have against Dresser, the provision is not an

affirmative defense to Page's cause of action. *See* TEX.R.CIV.P. 94 (listing release as an affirmative defense but not indemnity). Whether the provision can be enforced as an indemnity agreement is an immaterial question and, thus, is not reached. Accordingly, we overrule Dresser's first two points of error, which are based on the contention that the provision is an affirmative defense to Page's cause of action.

## HOUSTON PROVISION

■ Houston relies on these provisions to release it from all liability to Page:

> 2. (A) *[Houston] shall not be liable to [Page] on any theory of legal liability* against which [Houston] may legally contract *for any injury or damage* to persons ... or *to property (whether subsurface or not, including reservoir loss)* and any losses arising out of such damage *where such damage is sustained in connection with, arising out of, or resulting from the service or material used in the service.*
>
> .   .   .   .   .
>
> (D) *The theories of liability referred to in [paragraph] (A)* ... immediately preceding, *include,* but are not limited to, breach of express or implied warranty and *the sole or concurrent negligence of [Houston].*

(Emphasis added).

The italicized language contains the agreement between the parties: "[Houston] shall not be liable to [Page] on any theory of legal liability [including 'the sole or concurrent negligence of [Houston]'] ... for any injury or damage ... to property (whether subsurface or not, including reservoir loss) ... where such damage is sustained in connection with, arising out of, or resulting from the service or material used in the service." Their agreement has all of the characteristics of a release and none of indemnity: it creates no cause of action, refers only to a surrender of claims between the parties to the agreement, and contains no promise of protection against claims of third parties.

Considering the unambiguous language of the provision, the parties intended paragraph 2(A) to be a release of liability. Thus, its enforcement will depend upon the common-law rules relating to releases.

## IS HOUSTON'S RELEASE ENFORCEABLE?

We reject Page's interpretation of the Houston provision as an indemnity agreement. Nevertheless, Page states three reasons why the provision is unenforceable, which we will consider as attacks on its legality as a release of liability.

FAIR NOTICE

■ Page contends the evidence raised a fact issue whether the exculpatory provision was conspicuous enough in Houston's contract to give Page's representative fair notice that its effect was to absolve Houston from liability for its own negligence. Page argues that the provision is unenforceable because Houston failed to obtain a finding that it was conspicuous enough to give fair notice. By considering this contention we do not hold that the requirements of conspicuousness and fair notice are applicable to releases. *Compare, Goodyear Tire & Rubber Co. v. Jefferson Const.,* 565 S.W.2d 916, 919 (Tex.1978) (holding that a provision *indemnifying* a person against his own negligence must be conspicuous enough to give the indemnitor fair notice of its existence).

■ Page misplaces the burden of obtaining a finding relating to fair notice. When a release is interposed and established as a bar against the plaintiff's action, the plaintiff must plead and obtain findings on any fact issues that will avoid or invalidate the release. *Womble v. Atkins,* 160 Tex. 363, 331 S.W.2d 294, 296 (1960); *Ellis v. Woods,* 453 S.W.2d 509, 510 (Tex.Civ.App.—El Paso 1970, no writ). Houston pled and established the release as an affirmative defense by obtaining a finding that Page's representative had the authority to bind Page to the agreement. Consequently, Page had the burden of obtaining any finding that would avoid its effect. *See id.* Having failed to obtain a finding that the provision was not conspic-

uous enough to give fair notice, Page waived whatever defense that might have been to the release's enforcement. *See id.*

■ The concurring-dissenting opinion apparently would hold, even in the face of Page's insistence that the evidence raised a fact issue on fair notice, that the exculpatory provision was inconspicuous as a matter of law. Fair notice is generally a fact question and is a question of law only when reasonable minds cannot differ. *Jefferson Const.,* 565 S.W.2d at 918–19. Reasonable minds could differ on whether the provision was conspicuous enough to give fair notice.

■ The release relied on by Houston is similar in location and prominence to the indemnity agreement in *Jefferson Const.,* which the Supreme Court said raised a fact issue on fair notice. *See id.* at 920. Printed in ordinary size type at the top of the front of the Houston document is the following:

> The undersigned [does] hereby certify that I have full authority to authorize [Houston] to perform services on this well and obligate [Page] to pay for same. It is understood that such services will be performed upon the terms and conditions printed on the back of this form.

The signature of Page's representative appears immediately below this provision. On the reverse side of the document, under TERMS AND CONDITIONS—SERVICES, appears the release provision, printed in ordinary size type and clearly separated from other provisions in a numbered paragraph. The release is neither hidden by a misleading heading nor surrounded by unrelated terms. These circumstances at least raised a fact issue whether the provision was conspicuous enough to give fair notice of its existence, which obligated Page to obtain a finding on the fact issue to avoid the release's effect. *See id.*

EXPRESS–NEGLIGENCE TEST

■ Page argues that the provision is unenforceable because it violates the express-negligence test, which the Supreme Court adopted for determining whether parties to an *indemnity* agreement intend to exculpate the indemnitee from the conse-

quences of his negligence. *See Ethyl Corp. v. Daniel Const. Co.,* 725 S.W.2d 705, 708 (Tex.1987). We have found no authority extending this doctrine to releases. In fact, the Dallas court of appeals has refused to do so. *Whitson,* 773 S.W.2d at 383. We, likewise, decline to extend the express-negligence test to a release which absolves a party of liability for his own negligence.

■ Even if applicable, the release nevertheless meets the test: it unambiguously and expressly states that Houston will not be liable to Page on any legal theory, including Houston's *sole or concurrent negligence,* for any property damage arising out of Houston's services on the well. *See Ethyl Corp.,* 725 S.W.2d at 708.

SECTION 127.003

■ Page contends the provision is unenforceable under section 127.003 of the Civil Practices and Remedies Code, which voids any agreement pertaining to an oil or gas well that indemnifies a person against his own negligence. *See* Tex.Civ.Prac. & Rem.Code Ann. § 127.003(a)(1) (Vernon 1986). This section is not applicable because nothing in chapter 127 of the Civil Practices and Remedies Code indicates that the legislature ever intended its provisions to apply to a release.

Houston established the release as an affirmative defense to Page's cause of action. Page failed to establish any defense to its enforcement. Page clearly intended to release any cause of action arising out of Houston's ordinary negligence. Thus, the release is an absolute bar to Page's recovery, which is based on Houston's negligence, and entitles Houston to a take-nothing judgment as a matter of law. *See Hart,* 189 S.W.2d at 494. The court should have granted Houston's motion to disregard the liability findings and for a judgment on the verdict. We sustain Houston's first point and do not reach its remaining points of error.

DRESSER'S REMAINING POINTS

■ Dresser contends the court erred when it submitted an instruction on *res*

*ipsa loquitur* without any evidence to support its submission. The jury answered the following global question on negligence:

### QUESTION NO. 1

With respect to the occurrence in question, were any of the following parties negligent?

Answer "Yes" or "No" with respect to each of the following:

| | |
|---|---|
| Dresser | Yes |
| Houston | Yes |
| Cameron [2] | No |
| Page | Yes |

Page alleged several specific acts of negligence against Dresser. One cannot tell from the broad-form submission of the negligence question whether the jury found that Dresser committed one or more of the specific acts of negligence or inferred negligence based on the doctrine of *res ipsa loquitur*. In the circumstances, Dresser cannot demonstrate that the instruction, if erroneous, resulted in the entry of an improper judgment. *See* TEX.R.APP.P. 81(b)(1). Dresser's third point is overruled.

After the equipment became lodged in the well bore, Page tried a "side tracking" maneuver to try to save the well. This involved drilling through the casing of the damaged well above the lodged equipment and, through that opening, attempting to drill another well adjacent to the damaged well. *See Ebberts v. Carpenter Production Co.*, 256 S.W.2d 601, 621 (Tex. Civ.App.—Beaumont 1953, writ ref'd n.r.e.). When this remedial effort failed, Page was forced to abandon the damaged well and drill a replacement well. The jury found that: (1) the cash market value of the well immediately before it was damaged was $836,000; (2) the salvage value of the well after it was damaged was $0; (3) the reasonable and necessary cost of the remedial work on the damaged well was $366,000; and (4) the reasonable and necessary cost of drilling and equipping the replacement well was $494,112. Based on

these findings and a finding apportioning 10% of the negligence to Dresser, the court entered a judgment against Dresser for $83,600 (1/10th of $836,000), plus $63,-993.03 in prejudgment interest.

Dresser's final complaint is that its share of liability should have been 1/10th of $494,112, the cost of drilling and equipping the replacement well. Page points out, however, that the cost of drilling the replacement well ($494,112), plus the cost of the remedial work on the damaged well ($366,000), minus the damaged well's salvage value ($0), equals $860,112. Because that total exceeds the abandoned well's market value ($836,000), Page contends the court properly limited total damages to $836,000. Essentially, the question is whether Page is entitled to recover $366,-000, the remedial costs it expended in trying to sidetrack the damaged well.

Page is entitled to recover the $366,000. *See Dowell, Inc. v. Cichowski*, 540 S.W.2d 342, 352 (Tex.Civ.App.—San Antonio 1976, no writ). In fact, the court in *Cichowski* allowed the plaintiff to recover $76,706.33, which included $13,706.33 for remedial repairs to the abandoned well and $63,000 for the net cost of drilling and equipping a replacement well, even though the market value of the abandoned well was only $66,-000. *Id.* Based on that authority, one could argue that the court improperly limited Page's damages to $836,000, the market value of the abandoned well. However, Page makes no such complaint and that issue is not before us. Dresser's fourth point is overruled.

Page's causes of action against Dresser and Houston are severed from each other. The portion of the judgment granting Page a recovery against Houston is reversed and reformed to render a judgment that Page take nothing against Houston. However, the portion of the judgment against Dresser is affirmed.

VANCE, Justice, concurring in part and dissenting in part.

I concur in that portion of the opinion affirming Page's recovery against Dresser and dissent from that portion reversing its

---

2. Cameron is not a party to this appeal.

recovery against Houston. I do not believe that we should either classify the agreements as providing for indemnity or a release or engage in the fiction of writing a party out of an agreement obviously intended to cover that party.

## THE DRESSER AGREEMENT

Dresser pled its indemnity agreement both as a release of liability and as the basis for a counterclaim. The agreement, prepared by Dresser in indemnity-agreement form, was intended to transfer to Page the risk of any liability (other than for gross or wilful negligence) arising out of Dresser's services on the well site, including damages for personal injuries, subsurface damages, and damage to the well itself. Although it encompasses damage suffered by Page, Page's employees, or third parties, we are concerned with the agreement only as it relates to Page.

EXPRESS NEGLIGENCE RULE

The express negligence rule is that a party seeking indemnity from the consequences of that party's own negligence must express that intent in specific terms within the four corners of the contract. *Enserch Corp. v. Parker*, 794 S.W.2d 2, 8 (Tex.1990); *Ethyl Corp. v. Daniel Const. Co.*, 725 S.W.2d 705, 707–08 (Tex.1987). The agreement between Dresser and Page addresses "claims alleging that injuries or damage were caused by our negligence." Thus, we find expressed within the four corners of the contract the intent of the parties that Page indemnify Dresser against loss by Page arising out of Dresser's negligence. *See id.* I would hold that Dresser's agreement meets the criteria of the express negligence rule. *See id.*

THE "CONSPICUOUS" REQUIREMENT

Page points out that the court was justified in denying indemnity to Dresser because the indemnity portion of the contract was not sufficiently conspicuous to be enforceable. The indemnity agreement is part of one of eighteen uniformly printed and spaced paragraphs printed on the reverse side of the contract. The face of the contract includes a paragraph containing over one hundred thirty words, in regular size type, without color or other distinguishing characteristics, incorporating the eighteen paragraphs on the other side of the contract.

An indemnity agreement must be conspicuous in order to provide "fair notice" and to prevent an obvious injustice. *Enserch Corp.*, 794 S.W.2d at 8; *K & S Oil Well Service, Inc. v. Cabot Corporation, Inc.*, 491 S.W.2d 733, 737–38 (Tex.Civ.App.—Corpus Christi 1973, writ ref'd n.r.e.). Here, as in *K & S Oil*, the indemnity provision was hidden, located on the reserve side of what in reality is a work order under the heading "Terms and Conditions." *See K & S Oil*, 491 S.W.2d at 737–38. The paragraph including the agreement begins with: "There are obviously many conditions in and about the well of which we can have no knowledge and over which we can have no control. Therefore, we accept this service order only on condition that we do not guarantee any particular results from services to be performed hereunder." By contrast, the agreement in *Enserch*, which the Supreme Court held was sufficiently conspicuous, was on the front side of the contract, not hidden under a separate heading, and was not surrounded by unrelated terms. *Enserch Corp.*, 794 S.W.2d at 9. I would hold that as a matter of law Dresser cannot enforce the indemnity agreement because it was not sufficiently conspicuous. *See K & S Oil*, 491 S.W.2d at 737–38; *see also Rourke v. Garza*, 511 S.W.2d 331, 344 (Tex.Civ.App.—Houston [1st Dist.] 1974), *aff'd*, 530 S.W.2d 794 (Tex.1975); *Safway Scaffold Co. v. Safway Steel Products*, 570 S.W.2d 225, 228 (Tex.Civ.App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.).

## THE HOUSTON AGREEMENT

Houston pled that its agreement was a release by Page from any liability arising out of Houston's services on the well site. To distinguish between potential liability to Page and to third parties, Houston drafted the provision exculpating itself from liability to Page without using the term "indemnity," reserving that language for successive paragraphs relating to liability to third

parties. The intent was to transfer the risk of liability to Page for its (Houston's) own negligence. This case presents an ideal comparison of the use of differing language, because the Houston agreement has, as to Page, the same effect as Dresser's agreement. Because no good reason exists to distinguish between them, I would extend the express negligence rule to releases and other exculpatory agreements which do not use the traditional language of "indemnity."

No sound policy reason exists to apply or not apply the requirements of the express negligence rule based only on the label which the parties or a court may affix to the agreement. All such agreements involve the transfer of risk and are necessarily interrelated with considerations of insurance coverage against the risks transferred. In the business world this includes considerations of the time necessary to acquire insurance against risks associated with the negligence of another, the increasing costs of such coverage, and the fact that such coverage is increasingly difficult to obtain. It stands to reason that every business is in a better position than its customers to obtain insurance against the risks associated with its own negligence and to keep that insurance in place. The business and its insurance representatives have time to evaluate the risks, negotiate their way through complicated insurance markets, and obtain competitive prices. The customer, on the other hand, has limited knowledge of the risks associated with the business of the other party, may contract for goods or services on short notice, and does so through field representatives who may or may not understand the nature or effect of a risk-transfer agreement. A contracting party should be on fair notice that he may, through no fault of his own, suffer a large and ruinous loss solely by reason of negligence of the other contracting party. *K & S Oil*, 491 S.W.2d at 737. Public policy "looks with disfavor upon attempts of a party to avoid liability for his own fault...." *See id.* at 738.

If the effect of an agreement is to exculpate a party from the consequences of its own negligence, the "better policy is to cut through the ambiguity of those provisions" and apply the express negligence rule. *See Ethyl Corp.*, 725 S.W.2d at 708. Although the Supreme Court in *Ethyl* addressed an indemnity agreement rather than a release or other type of exculpatory agreement, "the policy considerations underlying the enforcement of either type of contract are similar enough to warrant application of the express negligence doctrine to releases." Comment, *Releases: An Added Measure of Protection from Liability*, 39 BAYLOR L.REV. 487, 492 (1987) (authored by Julie Ann Springer). Thus, I would not enforce any agreement, whatever its form, which transfers the risks of one's own negligence to another party in the absence of an express, conspicuous agreement made by a person who is in a position to make an informed decision about the nature of the risks being transferred and who has a real choice in accepting or rejecting the agreement. *See Ensearch Corp.*, 794 S.W.2d at 8–9 (applying both the express negligence rule and the "conspicuous" requirement); *Haring v. Bay Rock Corp.*, 773 S.W.2d 676, 678 (Tex.App.—San Antonio 1989, no writ) (applying the express negligence rule to an agreement which did not use the term "indemnity"); *Whitson v. Goodbodys, Inc.*, 773 S.W.2d 381, 383 (Tex.App.—Dallas 1989, writ denied) (recognizing that a disparity in bargaining power may leave a party no real choice in accepting the agreement); *Monsanto Co. v. Owens–Corning Fiberglas*, 764 S.W.2d 293, 295 (Tex.App.—Houston [1st Dist.] 1988, no writ) (finding that failure to use the term negligence and specify the extent of coverage, i.e., comparative negligence, concurrent negligence or gross negligence, caused agreement to fail the express negligence test); *K & S Oil*, 491 S.W.2d at 738 (stating that "the term negligence or fault must be used"); *see also* TEX.CIV.PRAC. & REM.CODE ANN. Chapter 127 (Vernon 1986 and Vernon Supp. 1991) (concerning certain risk-transfer agreements where the indemnitor supports the agreement with insurance coverage against those risks); Comment, *Releases: An Added Measure of Protection from*

*Liability,* 39 BAYLOR L.Rev. 487 (1987) (authored by Julie Ann Springer).

EXPRESS NEGLIGENCE RULE

Houston's agreement states, in pertinent part:

2. (A) [Houston] shall not be liable to [Page] on any theory of legal liability against which [Houston] may legally contract for any damage (whether subsurface or not, including reservoir loss) to any property of [Page] and loss arising out of such damage where such damage is sustained in connection with, arising out of, or resulting from the service or material used in the service.

. . . . .

(D) The theories of legal liability referred to in paragraphs (A), (B), and (C) immediately preceding, include, but are not limited to, breach of express or implied warranty and the sole or concurrent negligence of [Houston].

Thus, the language expresses the intent that Houston would not be liable to Page for Houston's own negligence in specific terms within the four corners of the contract. *See Enserch,* 794 S.W.2d at 8; *Ethyl,* 725 S.W.2d at 707-08. The fact that the extent of coverage provision appears in a separate paragraph is of no consequence; the agreement need not be confined to a single sentence. *See Enserch,* 794 S.W.2d at 8. I would hold that Houston's release meets the criteria of the express negligence rule. *See Enserch,* 794 S.W.2d at 8; *Ethyl,* 725 S.W.2d at 707-08.

THE "CONSPICUOUS" REQUIREMENT

Page also asserts that the court was justified in not giving effect to Houston's release because the release provision of the contract was not sufficiently conspicuous to be enforceable. The release paragraph is one of many similarly printed and spaced paragraphs printed on the reverse side of the contract. The face of the contract includes a paragraph under the heading "Work Order," in regular size type, without color or other distinguishing characteristics, incorporating the paragraphs on the other side of the contract.

Here, as in *K & S Oil,* the release was hidden, located on the reverse side of the work order under a sub-heading "Terms and Conditions–Services." *See K & S Oil,* 491 S.W.2d at 737-38. The agreement begins with: "[Houston] does not guarantee the successful performance of the service involved and shall not be subject to any legal liability for failure to accomplish the desired result." By contrast, the agreement in *Enserch,* which the Supreme Court held was sufficiently conspicuous, was on the front side of the contract, was not hidden under a separate heading, and was not surrounded by unrelated terms. *Enserch Corp.,* 794 S.W.2d at 9. I would hold that as a matter of law Houston cannot enforce the release because it was not sufficiently conspicuous. *See K & S Oil,* 491 S.W.2d at 737-38; *see also Rourke,* 511 S.W.2d at 344; *Safway Scaffold Co.,* 570 S.W.2d at 228.

I would affirm the judgment.